* IN THE MATTER OF WILLIAM H. SNYDER, AS EXECUTOR, ETC., OF JABEZ OLMSTEAD, DECEASED.

*Contempt — the failure of an executor to pay over money as required by the terms of a decree, is punishable as a contempt — Code of Civil Procedure, secs. 2552, 2555.*

Where, upon the judicial settlement of the accounts of an executor, in a Surrogate's Court, a decree is entered adjudging that a balance of the moneys, actually received by him, still remains in his hands, and directing him to pay the

---

* In this and the following cases in this department, decisions handed down December 27, 1884.

same to different persons therein named, the failure of the executor to pay the same, after demand therefor has been duly made, is a contempt of the court, within the meaning of section 2555 of the Code of Civil Procedure, and is punishable as such by the imposition of a fine equal in amount to the sum adjudged to be in the executor's hands, and by his commitment to a jail until the same shall be paid.

The fact that upon the return day the executor files his own affidavit in the Surrogate's Court and therein alleges that he is unable to comply with the terms of the decree, and that he has no means wherewith to pay the amount claimed, furnishes no reason for denying the application for his commitment. (LEARNED, P. J., dissenting.)

APPEAL from an order of the Surrogate's Court of Rensselaer county, adjudging the appellant, an executor, to be in contempt for refusing and neglecting to pay over certain sums of money, as prescribed by a decree made upon the settlement of his accounts as executor, and imposing a fine upon him as a punishment for such contempt, and committing him to the county jail until the same should be paid.

*James Lansing*, for tne appellant William H. Snyder.

*J. A. Cipperly*, for the respondents.

FISH, J.:

The appellant was executor of Jabez Olmstead, deceased, and, as such, received the moneys and property belonging to the deceased and assumed the general burden of the trust. In due time he was called to account and rendered an account before the Surrogate's Court; and the Surrogate's Court, in such proceedings, on the 29th March, 1882, made a decree in which it charged the appellant, as such executor, with divers moneys received by him as such, credited him with divers sums properly paid and expended, and adjudged that there remained a balance in his hands, for which he was accountable, of $2,975.70, which sum the decree directed the appellant to pay to divers persons therein named. The decree was soon thereafter properly served on appellant and a demand made upon him for payment of several of the sums decreed to be paid. He refused to pay and has continued since to neglect and refuse payment. A transcript of said decree was filed in the office of the clerk of Rensselaer county, being the county where appellant

resided, and the same was docketed and execution issued to the sheriff against the property of appellant, which has since been returned wholly unsatisfied. Thereupon application was made to the surrogate of Rensselaer county for an order that appellant show cause before the Surrogate's Court, on a day named, why he should not be punished for contempt in disobeying the directions of the decree in refusing to pay the money. The affidavit on which the order to show cause was granted, states, in terms, "that appellant willfully neglects to obey said order and decree." On the return day of said order the appellant appeared and filed an affidavit stating, in substance, that his only reason for not complying with said decree was his inability to procure the money with which to make payment; and alleging that he has made diligent effort to obtain the money, but has failed; that if he had the means to pay with he would promptly pay, and pleads the impaired health of both himself and wife, and his necessary duty to her as her medical adviser, against the impending action of the Surrogate's Court. The appellant also, in an additional affidavit, undertakes to explain why he is unable to pay, which is to the effect that the funds and money which came into his hands as such executor, were lost by him in his private business in the year 1876. The appellant offered no proofs on the subject, relying alone upon his own uncorroborated affidavits to acquit himself of the charge of willful neglect to pay. Affidavits were also filed on the part of the relators, which tend to show that subsequent to the time when appellant claims to have lost the trust fund, and on or about January 14, 1878, the appellant, through Emily S. Willis, his daughter, who served as the conduit, conveyed to his wife real estate of the value of over $15,000 for a consideration expressed of $3,300; that said real estate covered the business stand where appellant had for a long time been doing business in his own name, and where he has continued in possession, ostensibly carrying on the business the same as before said transfer, and under circumstances tending to show that the transfer of the real estate was a cover intended to protect the same against his creditors.

To this the appellant filed a further affidavit, in which he does not deny the transfer of the property to his wife, but insists that he is in possession as employe and servant of his wife, Catharine Snyder, and that said Catharine Snyder resides upon said premises

and has charge of and carries on the business in person, and has done so since she purchased the same in 1878; and by his said additional affidavit, generally denies that the transfer to his wife was a fraud or cover, but alleges that he was indebted to his wife in the sum of $3,300, to the Troy Savings Bank $2,500, which was a mortgage on the property, and $1,721.28 to one Henry Snyder, which his wife was to secure, making the total consideration of said transfer the sum of $7,521.28.

The appellant offered no proofs of the indebtedness to his wife or to Henry Snyder, nor any proof as to the value of the real estate conveyed to his wife, but chose to rely solely on his own affidavit. Thereupon, the surrogate made the order which is the subject of this appeal.

The said order, after reciting, among other things, that it appeared before him that the appellant willfully neglected to obey said decree or to pay the sum decreed to be paid, and that said William H. Snyder, executor as aforesaid, had committed the contempt with which he was charged, "and this court now adjudging him to be guilty of the misconduct alleged, and that such misconduct was calculated to and did defeat, impair and impede the rights and remedies," etc., provided that a fine of $1,525.20 be imposed upon the appellant, and that he pay the same, together with the sum of twenty-five dollars costs, and stand committed to jail until he shall have paid said fine, etc., the sum of the fine being just the aggregate of the sums which he neglected to pay as in the decree directed. Upon this state of facts I think the Surrogate's Court was fully justified in making the order committing the appellant for contempt. The surrogate was not bound to accept the uncorroborated statements of the defaulting executor to the effect that he had no money at his command, or as to what had become of the trust funds. The fact that the funds came into his hands is undisputed. He is presumed to have them in his possession or under his control, and that presumption will continue until he satisfies the court that by some cause over which he has no control he has become unable to produce them or replace them.

The Code (§ 2552) makes a decree of the surrogate, directing payment by an executor to a person interested in the estate, *conclusive evidence* that there are sufficient assets in his hands to satisfy

the sum directed to be paid. (And see *Seaman* v. *Duryea*, 11 N. Y., 330, opinion of court.) The *onus* is upon him to show why it is that he cannot obey the decree. When a trustee proposes to exonerate himself from the performance of a plain duty, he ought at least to make a plain showing of the reason why. Such is not the case here. The affidavits of appellant in answer to the order to show cause are vague and uncertain.

The first in order, while manifesting great respect for the court, and a willingness to make payment, simply protests his inability to pay. It states no facts showing how he came to the situation, or what became of his property; but simply that he has none. In the second affidavit he states that the money which came to his hands as executor was lost in 1876 by bad results in his private business, without giving any detail of facts that would admit of any other person making a successful inquiry into the business to see how far he told the truth.

In the first *two* affidavits he lays stress upon the feeble health of his wife, who is so badly off that it would probably shorten her life if deprived of his society and medical attendance. Then, when an explanation seems pressing, in answer to affidavits filed by relators, his wife at once becomes capable of active personal attention to the grocery business; and his affidavit states "that his wife has charge of, and carries on, the business in person, and has done so since she purchased the same in 1878." The affidavit of the wife is not produced in corroboration of his statement, not even to corroborate the *bona fides* of the real estate transaction with her. It may be assumed that his story is incapable of corroboration by any living witness. Thus standing alone, and upon such unsatisfactory affidavits, the executor, confessing to a criminal misappropriation of the trust fund, his protest of inability to pay is entitled to but little consideration.

There is nothing in this case which entitles the appellant to a charitable construction, or to any leanings in his favor. On the contrary, his conduct in relation to the estate, as confessed by him, is grossly reprehensible, and calls for the most stringent discipline on the part of the courts.

The appellant tells us that the reason why he cannot pay is because he committed the flagrant crime of putting the trust funds in his private business, and so lost them; and thus, finding himself

threatened with insolvency, instead of reimbursing the sacred fund out of the remainder of his property, concluded to let the whole loss fall upon the trust estate, and at once transferred all the residue of his property to his daughter and wife to secure an alleged indebtedness to his wife, thus putting it out of his power to restore the moneys stolen from the trust.

The facts stated admit of a strong suspicion (to put it no stronger) that the conveyance of his property to his wife was a mere cover to hinder his creditors, and to put it beyond the reach of the next of kin to the Olmstead estate. There has been no ostensible change in possession, he remaining in apparent control and conducting the business the same as before. There is no proof of any indebtedness to his wife, except his affidavit, and that stating no facts as to how the debt accrued, leaving the confidential dealings between himself and wife a mystery to his creditors. All this throws discredit upon the transaction. It is not necessary, however, at this time to pass upon that question, except so far as to say that he leaves the matter of his inability to pay doubtful and unsatisfactory.

The office of the executor is a sacred trust and calls for integrity of purpose and a strict observance of official duty. He who accepts such a trust, and then deliberately misappropriates the funds of the estate, cannot complain when the law and the courts lay a heavy hand upon him. It is a kind of robbery to which the courts ought not to lend even tacit encouragement, but rather administer emphatic rebuke. No language of condemnation is too strong for the case. The statute, at a late day, has made it a crime, and the courts should not be tardy in the exercise of every lawful power to save a trust estate from the devastation of an executor.

Prior to the enactment of the present Code of Civil Procedure, there was considerable difficulty in determining what were the powers of the Surrogate's Court in matters of this kind, and as to the manner of executing its power. It was held *In Matter of Watson* v. *Nelson* (69 N. Y., 537), that disobedience to a surrogate's decree directing the payment of money generally, not out of a specific fund, to the persons entitled, was not a contempt for which a fine could be imposed upon the executor and he be committed to close custody as for criminal contempt.

That decision was made under the provisions of the Revised Statutes as then existing, which then only authorized a Surrogate's Court to enforce its decrees for the payment of money by attachment. No other ground was assigned by the court. Upon arrest and detention, by virtue of an attachment, he would be entitled to jail liberties., etc.; whereas, by an order committing him for contempt, he could be kept in close custody. And so it was held in that case, that under the statute, which is cited in the opinion of the court, the surrogate had exceeded his powers. The court, in deciding the case, lay stress upon the fact that the order or decree in that case was only to pay a sum generally as executor, *not specifying a particular fund,* evidently meaning and intending the counter proposition that if directed to pay out of a particular fund, then an order committing the executor for contempt in neglecting to pay would be sustained. And the court refer to and approve the decision in *Seaman* v. *Duryea* (11 N. Y., 324), where an outgoing guardian was proceeded against by attachment, followed by an order committing him for contempt for disobeying the decree of the surrogate in not paying to his successor the balance of estate found in his hands on final accounting.

So it is fairly inferable therefrom, that if it had appeared in the case in *Watson* v. *Nelson*, that the sums directed to be paid by the decree had been the *sums found to be in the hands of the executor as a balance of moneys received by him,* such a designation of fund would have been, within the meaning of the court, in speaking of a particular fund, under the control of the executor. For, as stated in *Seaman* v. *Duryea*, " in contemplation of law, the trust fund at all times remains in specie or invested as required by law, and the money or the proper securities *are or should be* in a situation to be delivered over at once." And, hence, an order or decree directing this to be done is not like an ordinary judgment for a given amount in an action at law.

And in *Baucus* v. *Stover* (89 N. Y., 1–5), the question arose, incidentally, whether where an executor was charged with his own debt due to the estate, the same as so much money on hand, although the executor was at the time insolvent and wholly unable to pay, he could be punished for contempt for not paying. The court, in an elaborate opinion, held that although the debt may be treated as money

in his hands for the purpose of administration, yet it would not for all purposes stand on the same footing as if he had actually received so much money. If the executor was wholly unable to pay the money, in pursuance of an order or decree of the surrogate, on account of his insolvency, he should not be attached or punished for contempt, as he could be if the money had actually been received from some other debtor. Although the question of punishment for contempt was not necessarily decided in that case, yet it was clearly the prevailing opinion of the court that where an executor had actually received money belonging to the estate, he could be proceeded against by attachment and punished for contempt in not complying with an order of the surrogate to pay over the money; that it was only in such cases as where he had not actually received the money, but was made liable for some other cause and wholly unable to pay, that he might be excused.

All the cases so far cited arose under the provisions of the Revised Statutes, and before the present Code became a law.

But whatever of uncertainty existed as to the power of a Surrogate's Court on this subject before, is all made plain by the sections of the Code before cited.

Section 2552 makes a decree of a Surrogate's Court, directing the payment of money by an executor to any person interested in the estate or fund, *conclusive evidence* that there are sufficient assets in his hands to satisfy the sum which the decree directs him to pay.

Section 2555 is equally emphatic in its provisions. By that section, a decree of a Surrogate's Court, directing the payment of money, may be enforced by serving a certified copy on the executor, and the willful neglect or refusal to obey it, by punishing him for a contempt of court, in the following cases:

Subdivision 3 — Where an execution against the executor has been returned unsatisfied; and further,

Subdivision 4 — Where the delinquent is an executor, and the decree relates to the fund or estate, the surrogate may so enforce the decree either with or without the return of the execution. So that, as the law now stands, the proceeding by attachment has been superseded, and the power to proceed by order resides in the surrogate. In the case in hand I think his power has been wisely and justly exercised.

These sections took effect on the 1st September, 1880 (see sec. 3347 of Code), so that all proceedings in all cases coming into the courts after that date came within the provisions of those sections. A remedial statute, not affecting the vested rights of parties, will be held to apply to all future proceedings, even though the trust was created (as in this case) before the law was passed; so that these provisions are applicable to any that arise to enforce any remedy. (*In re Dissosway*, 91 N. Y., 235.)

The whole matter rests with the surrogate of Rensselaer county. It will be within his power to modify the order under which the appellant is committed, if a case shall be made that addresses itself to his judgment, and that calls for such action.

Let the order be affirmed.

LANDON, J., concurred.

LEARNED, P. J. (dissenting):

I am unable to agree with the views taken by my brethren.

After the decree which charged the executor with a certain balance and directed its payment, execution was issued against his property and returned unsatisfied. Demand for payment was made and an order granted to show cause why he should not be punished. On the return of that order the executor showed his actual inability to pay; his insolvency and his want of any property whatever. These facts were really not disputed. The parties entitled to receive payment showed, by affidavit, that in 1878 the executor transferred property, which they claim was in fraud of creditors. The executor in response made an affidavit that the transfer was in consideration of valid debts and was not in excess of such debts. He also showed that when he received the money of the estate and used it in his business (about 1876), he believed the money would be safe and he would be able to produce it when called upon, but that he had, since that time, suffered losses in his business. As the petitioner did not dispute the fact of the executor's actual insolvency and inability to pay at the present time, those facts must be taken as conceded. Undoubtedly the executor did wrong in using the money of the estate in his business. But it is not for that act that he is adjudged in contempt. So, if the transfer of his property was to pay valid debts, it was a lawful transaction. If, on the other hand, it was made

to defraud creditors, the executor cannot set it aside and get the prop-erty back. In any case he cannot be punished as for a contempt, because he transferred his own property, fraudulently or otherwise. Laying aside the cases where a person may be fined for misconduct in court and the like, I understand that the process of punishment for contempt is intended to compel a person to do that which he can do. It is not proper to punish him for not doing that which he cannot do. This is the doctrine of *Watson* v. *Nelson* (69 N. Y., 536), and it is illustrated by the case of *Baucus* v. *Stover* (89 N. Y., 1). If we take the Code (§ 2555), the language is, "refuses or willfully neglects to obey." One does not refuse or willfully neglect to do that which he cannot do. If the executor had funds in his hands, or if he was in possession of securities and refused to deliver the securities or pay the funds, the case would be different. But in this case he is fined to the whole amount of the balance due from him, and is committed to jail until he shall pay this fine and costs and fees; that is to say, he is to be imprisoned for life, unless (as is probably hoped), the sympathy of his friends may induce them to raise the money. I do not think such is the law.

But it is said that by the Code (§ 2552), the decree of settle-ment is conclusive evidence that there are sufficient assets in the hands of the executor. This cannot mean that it is conclusive as to his actual ability to pay. If this were so, then the surrogate could never at any future time, relieve this executor from imprisonment, because there would be a conclusive decree that the executor was able to pay. This difficulty was seen in *Baucus* v. *Stover*, where it was held that while an executor should be charged in his accounting with a debt owing by him to the deceased, yet that he should not be liable therefor as if it were money actually in his hands. Yet the Revised Statutes use language which, if unquali-fied, would make the executor chargeable as for so much money received. I think, therefore, that section 2552 must be understood to mean that the decree is conclusive as to the amount with which the executor is chargeable; and that it does not mean that it is conclusive as to his actual possession of the funds. (Compare this section with 3 R. S. [5th ed.], p. 204, of which it seems to be a re-enactment.)

It is said that, as the executor once received these funds, he is

presumed to have them still. But a man is not to be imprisoned for life upon a presumption. That he is chargeable with the funds is true. It is true, also, that he ought to pay them to the petitioners. But when he has no means or power to pay, he ought not to be punished for not paying.

It may be said that the surrogate may hereafter discharge the executor. But what ground can the executor present at a future day for his discharge, which he does not now present? If inability to comply with the decree will be a reason for the discharge a year from this time, then it is a reason now why he should not be imprisoned, otherwise the power of commitment in such cases is at the mere will of the court as to its continuance. The executor has misused trust funds. That may make him liable under chapter 208, Laws 1877. It may make him liable to an execution against the person. But I do not believe that such an act, or the inability to pay caused thereby, makes him liable to perpetual imprisonment, or to imprisonment at the future discretion of the Surrogate's Court.

I think the order should be reversed.

Order affirmed, with costs.